**Nos. 5:26-cv-02170 (CH) & 5:26-cv-02211 (CH)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

In re Whitehall Trust,
*Debtor*,
Lehigh Valley 1, LLC,
*Appellee*.

---

In re Saucon Trust,
*Debtor*,
Lehigh Valley 1, LLC,
*Appellee*.

---

*On Appeal from the Order of the United States Bankruptcy Court for the Eastern District of Pennsylvania Granting Secured Creditor's Motion to Dismiss the Trust Debtors' Bankruptcy Cases, No. 25-15241 (PMM)*

---

# OPENING BRIEF OF APPELLANTS WHITEHALL TRUST AND SAUCON TRUST

---

Natalie D. Ramsey
Rachel Jaffe Mauceri
ROBINSON & COLE LLP
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel.: (215) 398-0600
nramsey@rc.com
rmauceri@rc.com

Eric Del Pozo
(*admitted pro hac vice*)
ROBINSON & COLE LLP
One State Street
Hartford, CT 06103
Tel.: (860) 275-8200
edelpozo@rc.com

*Counsel for Appellants Whitehall Trust and Saucon Trust*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Bankruptcy Procedure 8012, Appellants Whitehall Trust for Senior Care (f/k/a Whitehall Trust) and Saucon Trust state that (i) Whitehall Manor, Inc., and Saucon Valley Manor, Inc., are also debtors in these jointly administered Chapter 11 bankruptcy cases; and (ii) neither of the Appellant Trusts has a parent corporation, nor does any publicly held corporation own 10% or more of stock in either Trust.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

ORAL ARGUMENT STATEMENT ........ 1

PRELIMINARY STATEMENT ........ 1

FACTUAL AND PROCEDURAL BACKGROUND ........ 4

I. The Relevant Trusts and Timelines ........ 4

A. Overview of the Trusts and Their Related Manors ........ 4

B. Whitehall Trust's Formation and Procurement of Loans ........ 5

C. Saucon Trust's Formation and Procurement of Loans ........ 8

D. The Trusts' Business Activities and Subsequent Developments ........ 10

II. Procedural History ........ 12

A. Secured Creditor Lehigh Valley 1 Moves to Dismiss the Trusts' Chapter 11 Cases ........ 12

B. The Bankruptcy Court Grants the Motion to Dismiss ........ 14

STANDARD OF REVIEW & SUMMARY OF ARGUMENT ........ 19

ARGUMENT ........ 22

I. A Trust Created Primarily for a Business Purpose Is a "Business Trust" Under the Bankruptcy Code. ........ 22

II. The Bankruptcy Court Erred in Concluding that Whitehall Trust and Saucon Trust Are Not Business Trusts Eligible for Bankruptcy. ........ 31

A. Whitehall Trust and Saucon Trust Were Formed for Similar Business Purposes. ........ 31

1. The Trusts' formation and relevant documents reflect a purpose to promote a business enterprise. ........ 32

2. The Trusts effectuated their business purpose over time. ........ 36

B. These Trusts Are Sufficiently Distinct from Estate-Preservation or Other Nonbusiness Trusts to be Eligible for Bankruptcy. ........ 40

CONCLUSION ........ 45

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Asociacion de Titulares de Condominio Castillo*,
581 B.R. 346 (B.A.P. 1st Cir. 2018) ....................26

*City of Lincoln v. Ricketts*,
297 U.S. 373 (1936)....................25

*U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*,
583 U.S. 387 (2018)....................19, 20

*EPA v. Calumet Shreveport Ref., LLC*,
145 S. Ct. 1735 (2025)....................23

*FDIC v. Meyer*,
510 U.S. 471 (1994)....................23

*GBForefront, L.P. v. Forefront Management Group*,
888 F.3d 29 (3d Cir. 2018) ....................15, 30, 35

*Gov't Emps. Ret. Sys. of Virgin Islands v. Gov't of Virgin Islands*,
995 F.3d 66 (3d Cir. 2021) ....................20

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024)....................24

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
594 U.S. 382 (2021)....................23

*In re 4 Whip, LLC*,
332 B.R. 670 (Bankr. D. Conn. 2005)....................27

*In re Blanche Zwerdling Revocable Living Trust*,
531 B.R. 537 (Bankr. D.N.J. 2015) ....................17, 43

*In re Cont'l Airlines, Inc.*,
932 F.2d 282 (3d Cir. 1991) ....................25, 27

*In re Dille Family Trust*,
598 B.R. 179 (Bankr. W.D. Pa. 2019) ........................................................16, 42

*In re Eagle Trust*,
1998 WL 635845 (E.D. Pa. 1998) ..............................................................16, 43

*In re Fed.-Mogul Glob. Inc.*,
684 F.3d 355 (3d Cir. 2012) ..........................................................................29

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*,
118 F.4th 322 (3d Cir. 2024) ........................................................................20

*In re General Growth Props., Inc.*,
409 B.R. 43 (Bankr. S.D.N.Y. 2009)..............................................................31

*In re Glob. Indus. Techs., Inc.*,
645 F.3d 201 (3d Cir. 2011) (en banc) ..........................................................19

*In re Jin Suk Kim Trust*,
464 B.R. 697 (Bankr. D. Md. 2011) ..........................................................35, 41

*In re John Q. Hammons Fall 2006, LLC*,
573 B.R. 881 (Bankr. D. Kan. 2017)..........................................................40, 41

*In re Kenneth Allen Knight Trust*,
303 F.3d 671 (6th Cir. 2002) ...................................................................*passim*

*In re KRSM Props., LLC*,
318 B.R. 712 (B.A.P. 9th Cir. 2004) ...............................................................43

*In re Makowka*,
754 F.3d 143 (3d Cir. 2014) ..........................................................................19

*In re Mosby*,
791 F.2d 628 (8th Cir. 1986) (per curiam) .......................................................28

*In re Rubin Fam. Irrevocable Stock Trust*,
2013 WL 6155606 (Bankr. E.D.N.Y. 2013)...........................................31, 34, 39

*In re Secured Equipment Trust of Eastern Air Lines, Inc.*,
38 F.3d 86 (2d Cir. 1994) ........................................................................*passim*

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) ....................................................................19

*In re Treasure Island Land Trust*,
2 B.R. 332 (Bankr. M.D. Fla. 1980) ..........................................................28

*In re Tribune Co.*,
972 F.3d 228 (3d Cir. 2020) ....................................................................20

*In re Whitehall Trust*,
678 B.R. 498 (Bankr. E.D. Pa. 2026) ..................................................*passim*

*Little Four Oil & Gas Co. v. Lewellyn*,
35 F.2d 149 (3d Cir. 1929) ......................................................................15

*Montgomery v. Pinchak*,
294 F.3d 492 (3d Cir. 2002) ....................................................................20

*Morrissey v. Commissioner*,
296 U.S. 344 (1935)...........................................................................15, 28

*Pope & Cottle Co. v. Fairbanks Realty Trust*,
124 F.2d 132 (1st Cir. 1941)....................................................................24

*Ransom v. FIA Card Servs., N.A.*,
562 U.S. 61 (2011)...................................................................................23

*Toibb v. Radloff*,
501 U.S. 157 (1991)...........................................................................24, 44

*U.S. Gypsum Co. v. Schiavo Bros., Inc.*,
668 F.2d 172 (3d Cir. 1981) ....................................................................20

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989)..................................................................................24

**Statutes & Rules**

11 U.S.C. § 101 ...................................................................................*passim*

11 U.S.C. § 102 .........................................................................................26

11 U.S.C. § 109 .........................................................................................22

12 U.S.C. § 1715w ........................................................................................33

28 U.S.C. § 158 ............................................................................................19

24 C.F.R. § 232.2 ..........................................................................................33

24 C.F.R. § 232.3 ..........................................................................................33

72 Pa. Stat. § 8101-C ....................................................................................36

**Other Authorities**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 313 (1977) ...............................25

S. Rep. No. 95-989, 95th Cong., 2d Sess. 25 (1978) .....................................25

1 Collier on Bankruptcy ¶ 101.09 (2025) ......................................................26

## ORAL ARGUMENT STATEMENT

Appellants believe that oral argument will materially assist the Court in resolving the issues that this appeal presents.

## PRELIMINARY STATEMENT

Appellants Whitehall Trust for Senior Care (f/k/a Whitehall Trust) and Saucon Trust (together, the "Trusts") were formed to possess, own, refinance, lease, rehabilitate, and manage real estate on which related companies Whitehall Manor, Inc. and Saucon Valley Manor, Inc. (together, the "Manors") operate personal care homes for senior residents. For many years, the Trusts did exactly that. The Trusts borrowed millions of dollars to refinance and improve their properties, leased those properties to the Manors, collected rent, maintained fiscal reserves, contracted to perform improvements and repairs, serviced mortgage debt, ensured payment of taxes and other charges, and distributed profits to their primary beneficiary.

In December 2025, while in financial distress, the Trusts, along with the Manors, filed petitions for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Secured creditor Lehigh Valley 1, LLC ("LV1")—Appellee here—moved to dismiss the Trusts' Chapter 11 cases on the asserted ground that neither Trust is a "business trust" that is eligible

for bankruptcy relief. The Bankruptcy Court (Patricia M. Mayer, J.) agreed, granting the motion to dismiss.[1]

This Court should reverse that determination, and allow the Trusts' Chapter 11 cases to proceed, because the Bankruptcy Court erred in concluding that the Trusts are not "business trusts" under the Bankruptcy Code. In reaching that result, the Bankruptcy Court noted the lack of a statutory definition of this term, which has yielded the disparate tests that courts have previously adopted for a "business trust." Neither the Supreme Court nor the Third Circuit has decided the question.

After surveying the authorities, the Bankruptcy Court correctly recognized that a business trust must be created for a business purpose and that the analysis is necessarily case-specific. But its decision discounted the undisputed evidence of the Trusts' business purpose here—as reflected in the Trust Agreements and associated documents—and their extended course of activity effectuating that purpose. In addition, the Bankruptcy Court treated other alleged attributes of a business trust as effectively comparable in significance to the trust's business purpose.

Properly construed, a "business trust" under the Bankruptcy Code must have been created for the primary purpose of transacting business. This inquiry must consider the facts relating to the particular trust, and evidence of purpose may be

[1] The Bankruptcy Court has since granted the Trusts' motion to stay the dismissal order pending this appeal, and this Court has denied LV1's motion to vacate the stay, which remains in place.

found in the trust's governing documents, surrounding circumstances, or post-formation activities. The Bankruptcy Code does not make any discrete characteristic mandatory or dispositive, however, and a court should not engraft any such prerequisite onto the statute. The two federal courts of appeals to have substantively analyzed this question have endorsed a flexible, purposive, totality-of-the-circumstances standard for a business trust in bankruptcy.

Here, properly applying the appropriate legal test leads to a conclusion that the Trusts are business trusts that are eligible for Chapter 11 relief. Indeed, rather than existing primarily to protect and preserve their real properties, the Trusts actively exposed these properties to business risk by granting mortgages and security interests therein, with repayment tied to the revenues the care homes generated. That risk unfortunately materialized, necessitating the filing of Chapter 11 petitions. Holding the Trusts bankruptcy-eligible at the threshold will simply permit them, as they are entitled, to pursue confirmation of a plan of reorganization for the benefit of all stakeholders within the Bankruptcy Code's dedicated framework.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Relevant Trusts and Timelines

#### A. Overview of the Trusts and Their Related Manors

Each of the Manors operates a personal care home for seniors who require assistance or supervision with daily living. *See* Decl. of Mr. Abraham Atiyeh in Supp. of First Day Mots. ("Decl.") ¶¶ 6-7, 16 (Appendix ("App.") 118-120); Feb. 24, 2026, Hr'g Tr. ("Tr.") at 16, 42 (App. 202, 228). The homes provide around-the-clock supervision and help the residents with things such as bathing, dressing, medication management, and meal preparation. Decl. ¶ 18 (App. 120). When these Chapter 11 cases were filed, the Manors combined had more than 300 residents and employed nearly 300 workers. *Id.* ¶ 20 (App. 121). Mr. Abraham Atiyeh is the primary beneficiary of Manor Trust, which owns both Manors, and he is the manager and main member of that trust's trustee. *Id.* ¶ 8 (App. 118).

Mr. Atiyeh formed both Whitehall Trust and Saucon Trust in 2007, in connection with a refinancing process for the Manors.[2] Tr. at 16, 21-22 (App. 202, 207-208). As Mr. Atiyeh testified, the Trusts "were designed for each manor." *Id.* at 58 (App. 244). The Trusts had the purpose of securing mortgages on the real estate, leasing their properties to the Manors for use by the personal care homes, managing

[2] The record on appeal contains standalone timelines of the developments relevant to each of these Trusts. DX-1, DX-2 (App. 290-291). This brief will use "DX" to refer to the Trusts' exhibits entered at the motion hearing.

the real properties, and handling property-related obligations. *Id.* at 15-16, 39 (App. 201-202, 225). As Mr. Atiyeh further testified, overall, the transactions were primarily profit-driven, with payments to the lenders expected to come from earnings of the businesses, which thus had to be profitable. *See id.* at 15, 36-37 (App. 201, 222-223).

Prior to forming the Trusts, Mr. Atiyeh held the Manor properties in his name. *Id.* at 19, 27 (App. 205, 213). By then, the Manors had operated for some time. *See* Decl. ¶¶ 13-14 (App. 119-120). He later contributed the parcels to the respective Trusts, which did not pay money for them. Tr. at 19, 27 (App. 205, 213). The Trusts have not received additional real property since. *Id.* at 39 (App. 225).

### B. Whitehall Trust's Formation and Procurement of Loans

In August 2007, the Whitehall Trust Agreement was entered into by Mr. Atiyeh and Whitehall Fiduciary, LLC, as Trustee. DX-13 (App. 421). Mr. Atiyeh is the manager and main member of Whitehall Fiduciary. Decl. ¶ 6 (App. 118).

The Trustee has, among others, the enumerated powers to hold property as an investment; to rent or lease property; to make all repairs and improvements deemed necessary; to pay taxes, insurance premiums, and other legal assessments; and to consent to the sale, mortgage, or lease of property. DX-13 § 4 (App. 425-430). The Trust Agreement identifies Mr. Atiyeh as the primary beneficiary and provides for its termination within 50 years, after the property passes to Mr. Atiyeh's spouse and

their children. *See id.* § 3 (App. 421-425). The beneficiaries cannot alienate their interests. *See id.* § 9 (App. 431).

The Whitehall Trust Agreement specifically authorizes the Trustee "to enter into agreements with" the U.S. Department of Housing and Urban Development ("HUD"), "and to pledge trust assets as security for the loan, and to enter into related loan documents." *Id.* §§ 4, 4.1 (App. 425). These provisions explicitly relate to a contemplated mortgage loan for "the assisted living facility known as Whitehall Manor." *Id.* § 15 (App. 433-435). These HUD-related terms applied as long as HUD held or insured the mortgage. *See id.* § 15 (App. 433).

The Trust Agreement remained irrevocable while HUD held or insured any note securing the "Project," *id.* § 15.6 (App. 434), and the grantor and beneficiary consented within the trust document to be bound by a "HUD Regulatory Agreement," *id.* § 4.1.2 (App. 425). The applicable HUD Regulatory Agreement defined the "Project" to include "the mortgaged property and all its other assets . . . used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto." DX-21 § 13(e) (App. 477).

In August 2008, Mr. Atiyeh conveyed to Whitehall Fiduciary, as Trustee of Whitehall Trust, a parcel of real property described as Unit Number 1 of Whitehall Manor Condominium, in the Township of Whitehall, Lehigh County, Pennsylvania.

DX-14 (App. 440). Contemporaneously, Whitehall Trust (through Whitehall Fiduciary) and M&T Realty Capital Corporation ("M&T") executed a mortgage for the HUD-backed refinancing loan. *See* DX-20 (App. 461).

Three months later, the Pennsylvania Board of Finance and Revenue assessed a transfer tax on this property conveyance by Mr. Atiyeh, who sought review of the assessment and lost. *See* Tr. at 22 (App. 208). The State Board concluded that because "Whitehall Trust was structured to operate a business by the Trustee," the Trust was not a tax-exempt "Ordinary Trust" under Pennsylvania's tax statutes. DX-16, at 3 (App. 450). The State Board also concluded that the irrevocability period disqualified this Trust from being a tax-exempt "Living Trust," which may be amended at any time.[3] *Id.* (App. 450).

In January 2012, Whitehall Trust refinanced the 2008 mortgage through an approximately $15.8 million loan from M&T, and these parties also entered into a security agreement. DX-1, DX-23 (App. 290, 485). An amendment to the Whitehall Trust Agreement limited that Trust's "business and purpose," while HUD insured the loan, to "the acquisition, ownership, operation and maintenance" of the real property for Whitehall Manor. DX-22 (App. 481).

[3] During a subsequent judicial appeal, the parties settled. DX-18 (App. 455).

### C. Saucon Trust's Formation and Procurement of Loans

In October 2007, Mr. Atiyeh conveyed to Saucon Trust a parcel of real estate described as Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, in the Borough of Hellertown, Northampton County, Pennsylvania.[4] DX-3 (App. 292).

The Saucon Trust Agreement bears the date of the property transfer. DX-4 (App. 298). This Trust's beneficiary-related provisions track those of Whitehall Trust. *See id.* §§ 2.2, 7 (App. 298-301, 306). So too do the Trustee's enumerated powers. *See id.* § 3 (App. 301-304). The Trustee of Saucon Trust had the authority "[t]o enter into a loan transaction with National Penn Bank and to pledge trust assets as security for the loan, and to enter into related loan documents, including but not limited to a Note, Loan Agreement, Mortgage, Assignment of Lease and Rents, and related documents." *Id.* § 3.12 (App. 302). The grantor reserved the right to revoke or amend this Trust Agreement. *Id.* § 12 (App. 307).

In an October 2007 financing transaction, National Penn Bank lent Saucon Trust money to pay off an existing loan. Tr. at 27-28 (App. 213-214); DX-6 (App. 318). In August 2009, those parties entered into another mortgage, with a security agreement. DX-7 (App. 345). The 2009 loan was a construction loan to

---

[4] The State Board of Finance and Revenue did not take a position on this transfer. Tr. at 41 (App. 227). Mr. Atiyeh does not recall, as of the Trusts' formation, filing any document with the Pennsylvania Department of State. *Id.* at 60 (App. 246).

Saucon Trust to build more units on the property. Tr. at 28-29 (App. 214-215). Mr. Atiyeh's goal was to increase rental payments from tenants and profits for the Trust. *Id.* at 29 (App. 215).

In January 2012, Saucon Management, LLC, succeeded Mr. Atiyeh as the Trustee of Saucon Trust. DX-4, First Amend. § 1.1 (App. 310). Mr. Atiyeh is the manager and main member of Saucon Management. Decl. ¶ 7 (App. 118). That month, the Saucon Trust Agreement was amended to reflect that this Trust holds property "upon which an assisted living facility known as Saucon Valley Manor is located," as well as to authorize the Trustee to execute any necessary documents or effectuate any other amendments required by HUD "or any lender in order to secure the financing for the Project." DX-4, First Amend. § 1.3 (App. 311).

An ensuing December 2012 amendment to the Saucon Trust Agreement refers to a HUD Regulatory Agreement and a HUD-insured loan. *Id.*, Second Amend. (App. 313-316). The relevant terms generally resemble those for Whitehall Trust, including the term addressing this Trust's "business and purpose." *See id.*, Second Amend. § 14(c)(viii) (App. 315). The applicable HUD Regulatory Agreement defines the "Project" to include the mortgaged property and all its other assets "used in or owned by the business conducted on said mortgaged property, which business is providing assisted living facility services." DX-9 § 13(e) (App. 389).

Also in December 2012, M&T provided Saucon Trust with a HUD-insured loan of approximately $19.5 million, for which these parties executed a mortgage and security agreement. DX-8, DX-10 (App. 372, 398).

**D. The Trusts' Business Activities and Subsequent Developments**

The Trusts generated revenue from rent collected from the Manors. *See* Decl. ¶ 24 (App. 122). Under the leases between the Trusts and their respective Manors, the Manors bore the ultimate responsibility for funding the property taxes, insurance, and operating expenses—generally encompassed within the rent. *See id.* ¶¶ 6-7 (App. 118); Tr. at 53-56 (App. 239-242).

To comply with the HUD Regulatory Agreements, the Trusts had to reserve funds for major repairs or improvements to the buildings. Tr. at 32 (App. 218); DX-9 § 2 (Saucon Trust), DX-24 § 2 (Whitehall Trust) (App. 385, 518). HUD inspectors would annually visit and point out necessary repairs to the buildings, which the Trusts would then have to complete. Tr. at 35, 62-63 (App. 221, 248-249). In addition, a HUD-approved public accounting firm annually audited the Trusts and Manors, individually and together. *Id.* at 33, 42-44 (App. 219, 228-230). The Trusts kept business records such as profit-and-loss statements and balance sheets. *Id.* at 32 (App. 218).

Mr. Atiyeh received profit distributions from the Trusts. *Id.* at 49-50 (App. 235-236). During the course of the HUD loans, based on the financial audits,

auditors would report to HUD on whether to approve the distributions, which would then be Mr. Atiyeh's profits from managing the real estate venture. *Id.* at 36 (App. 222). These distributions could come only from surplus cash on hand. DX-9 § 6(e), DX-24 § 6(e) (App. 386-387, 520).

The Trusts used a contractor to build the new rooms in Saucon Valley Manor and to perform maintenance and repairs for both Manors. Tr. at 34-35 (App. 220-221). A company that Mr. Atiyeh owns served as the management company for the Trusts, oversaw their operations, processed the rental payments, reconciled their accounts, and performed the repairs that HUD inspectors required. *Id.* at 56-57, 62-63 (App. 242-243, 248-249).

Prior to 2021, the Trusts were profitable, repaying approximately $24 million of principal and interest on the HUD-backed loans. *Id.* at 35-36 (App. 221-222). As Mr. Atiyeh has testified, however, beginning in March 2020, everything "basically collapsed." *Id.* at 59 (App. 245). As he has recounted, the COVID-19 pandemic produced staffing shortages, increased labor expenses and equipment costs, reduced resident numbers, and otherwise severely impacted the Manors' finances. Decl. ¶ 29 (App. 123).

After February 2021, the Manors ceased paying rent to the Trusts, which defaulted on the mortgages. *Id.* ¶¶ 31, 38 (App. 123, 125). As Mr. Atiyeh has

explained, the Manors focused available resources on providing for their residents and employees. *Id.* ¶ 38 (App. 125); Tr. at 59 (App. 245).

In 2023, after taking an assignment from M&T, HUD auctioned the mortgages—for less than one-quarter of their remaining balances—to Windstream Capital, LLC, which then assigned the mortgages and security agreements to LV1, the current holder. *See* Decl. ¶ 41 (App. 126).[5]

## II. Procedural History

### A. Secured Creditor Lehigh Valley 1 Moves to Dismiss the Trusts' Chapter 11 Cases

In December 2025, the Manors and the Trusts filed for Chapter 11 bankruptcy relief. By then, LV1 had already begun judicial foreclosure proceedings, in which this Court had appointed a Receiver.[6] Decl. ¶¶ 2, 35, 45 (App. 116, 125-126). Before the bankruptcy filings, the Court entered further orders requiring the remittance of prospective rental money to the Receiver and invalidating 2023 lease amendments

[5] *See also* HUD-Held Multifamily and Healthcare Loan Sale 2023-2 – Falcon Capital Advisors, Results Report, https://www.falconassetsales.com/asset-sales/completed-sales/mhls-2023-2 (visited Aug. 26, 2026) (stating that Whitehall and Saucon loans were sold for approximately $2.77 million and $3.45 million, constituting approximately 20 and 22 percent of the unpaid balances, respectively). All told, the Debtors have paid LV1 around $1 million since these bankruptcy cases began. *See* Sixth Interim Order ¶¶ H-J (May 29, 2026), No. 25-bk-15245, ECF No. 168.

[6] *See* Nos. 24-cv-2627 (CH) (Whitehall Trust) & 24-cv-2709 (CH) (Saucon Trust) (E.D. Pa.).

between the Trusts and Manors. *See In re Whitehall Trust*, 678 B.R. 498, 503 (Bankr. E.D. Pa. 2026) (discussing these developments) (App. 11).

After the bankruptcy proceedings began, LV1 moved to dismiss the Trusts' Chapter 11 cases on the asserted ground that neither Trust is a "business trust" within the meaning of 11 U.S.C. § 101(9)(A)(v), thus rendering them ineligible for bankruptcy relief. *See* Mot. of Secured Creditor Lehigh Valley 1, LLC to Dismiss Trust Debtors' Bankruptcy Cases (App. 139-153). In summary, LV1 asserted that the Trusts did not initially register as business trusts under Pennsylvania's Business Trust Act, do not possess sufficient indicia of a corporation, and never intended to engage in widespread investment and business activities.

The Debtors' objection to the dismissal motion countered that the Trusts were created for the primary purpose of carrying on business operations through their ownership and maintenance of improved real property on which their related Manors operate personal care homes for the residents. *See* Debtors' Obj. to Lehigh Valley 1, LLC's Mot. to Dismiss (App. 154-172). The objection emphasized that the Trusts were created to own, finance, rehabilitate, lease, maintain, and manage real estate used in the personal care facilities' operation; and that the Trusts had engaged in business activity, notably by obtaining and refinancing HUD-insured loans, maintaining reserve accounts, collecting rent, entering contracts, retaining

professionals, managing property, and servicing debt. The parties respectively submitted a reply (App. 173-181) and surreply (App. 182-186) on the motion.

On February 24, 2026, the Bankruptcy Court held a hearing on the motion to dismiss, at which Mr. Atiyeh testified, the parties submitted exhibits, and the court heard oral argument. (*See* App. 187-289.)

### B. The Bankruptcy Court Grants the Motion to Dismiss

In a Memorandum Opinion dated March 19, 2026, the Bankruptcy Court ruled that the Trusts are not "business trusts" under the Bankruptcy Code and dismissed their Chapter 11 cases. *See In re Whitehall Trust*, 678 B.R. 498 (App. 5-33).

At the outset, the Bankruptcy Court emphasized that federal law (rather than state law) governed the interpretative question, which necessitated construing a "term[] appearing in [the] United States Code." *Id.* at 505 (App. 15). The Court further noted that the parties had "stipulated that federal law should decide the outcome here."[7] *Id.* (App. 15).

The Bankruptcy Court then observed that "[n]either the Supreme Court nor the Third Circuit has squarely addressed what constitutes a 'business trust' under the [Bankruptcy] Code." *Id.* (App. 15). It proceeded to survey seven approaches that

---

[7] As the Trusts' counsel asserted below, "[T]he construction of what a 'business trust' means for purposes of Section 101(9)(a) is a federal question because it's the construction of a federal statute." Tr. at 75 (App. 261). LV1's counsel agreed that "the construction of the meaning of the term 'business trust' is a federal question. No dispute about that, it's a federal statute." *Id.* at 89 (App. 275).

prior decisions have taken when considering whether a trust is a "business trust" for bankruptcy, taxation, or jurisdictional purposes.

The first approach was that articulated in *Little Four Oil & Gas Co. v. Lewellyn*, 35 F.2d 149 (3d Cir. 1929), an early tax case. There, the Third Circuit distinguished between a trust in which "'the trustees merely collect dividends or interest, or rentals, and distribute them among the shareholders,'" and one that "'is organized or declared for business purposes and the trustees carry on an active business for profit.'" *In re Whitehall Trust*, 678 B.R. at 505 (quoting *Little Four Oil & Gas*, 35 F.2d at 150) (App. 15). The outcome turned on "'what the trust was actually doing through its trustees.'" *Id.* at 506 (quoting *Little Four Oil & Gas*, 35 F.2d at 151) (App. 16).

The second case reviewed was *Morrissey v. Commissioner*, 296 U.S. 344 (1935), another tax case, which the Bankruptcy Court described as "commonly paraphrased to define business trusts as those: (1) created *and* maintained for a business purpose; (2) whose property is held by trustees; (3) with centralized management; (4) which continue uninterrupted by deaths of beneficial owners; (5) whose interests are transferable; and (6) with limited liability." *Id.* (App. 16).

Third, the Bankruptcy Court analyzed *GBForefront, L.P. v. Forefront Management Group*, 888 F.3d 29 (3d Cir. 2018), which addressed the circumstances in which a trust can be considered a business trust for the purpose of determining its

citizenship in a federal diversity case. There, the Third Circuit held that, when performing such a jurisdictional analysis, courts should consider (i) the state laws pertaining to the trust's formation and nature; and (ii) the trust's purpose, whether to facilitate a donative transfer or to implement a bargained-for exchange. *In re Whitehall Trust*, 678 B.R. at 506-07 (citing *GBForefront*, 888 F.3d at 40-41) (App. 17).

Fourth, the Bankruptcy Court discussed *In re Secured Equipment Trust of Eastern Air Lines, Inc.*, 38 F.3d 86 (2d Cir. 1994). This Second Circuit decision analyzed the standard for a business trust under the Bankruptcy Code. Its "elusive" test, to the Bankruptcy Court, "boil[ed] down to a totality-of-the-circumstances inquiry." *In re Whitehall Trust*, 678 B.R. at 507 (App. 19). Among other things, the Second Circuit wrote that "'business trusts are created for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res.'" *Id.* (quoting *In re Secured Equipment*, 38 F.3d at 89) (App. 18).

The fifth through seventh cases selected included one district court and two bankruptcy court decisions from within this Circuit, each adopting a different standard for whether a trust is a bankruptcy-eligible business trust. *See id.* at 508-10 (App. 20-22), discussing *In re Eagle Trust*, 1998 WL 635845 (E.D. Pa. 1998) (adopting a four-element test), *In re Dille Family Trust*, 598 B.R. 179 (Bankr. W.D.

Pa. 2019) (adopting a two-prong test), and *In re Blanche Zwerdling Revocable Living Trust*, 531 B.R. 537 (Bankr. D.N.J. 2015) (adopting a holistic test focusing on the trust's purpose and operations).

The survey complete, the Bankruptcy Court compiled the following set of "attributes of a business trust": "(1) existence as such under applicable state law; (2) transferable, beneficial interests; (3) perpetual existence; (4) formation by investors; and (5) creation *and* maintenance for the purpose of conducting business." *In re Whitehall Trust*, 678 B.R. at 509-10 (App. 21-22). The Bankruptcy Court deemed indispensable only the last showing, which "essentially restates the issue presented" of "whether, within the meaning of the Code, the candidate trust is a business trust." *Id.* at 510 (App. 22). The Bankruptcy Court added that the ultimate "determination necessarily hinges on the facts and circumstances of a given case." *Id.* (App. 22).

Leaving business purpose for last, the Bankruptcy Court analyzed all its other chosen criteria but held none of them to be met. *See id.* at 510-14 (App. 22-29). It then concluded that the Trusts' collection of rental income from, and undertaking repairs and maintenance for, the Manors did not constitute a valid business purpose because the Trusts lacked "officers or retained employees" and the Manors "likely"

reimbursed the contractors' fees.[8] *Id.* at 514 (App. 29). Moreover, the Bankruptcy Court opined that the Trusts lacked "ongoing business operations" because they had, in years prior, ceased collecting rent from the Manors and defaulted on the mortgages (prompting the bankruptcy filings). *Id.* at 515-16 (App. 32-33).

On the Trusts' motion, the Bankruptcy Court stayed the dismissal order pending this appeal. As relevant here, that court held "that the debtors have a reasonable chance of success on appeal given the wide array of decisions on the issue of what constitutes a business trust and whether the debtors here fit within that definition for eligibility purposes."[9] Apr. 2, 2026, Hr'g Tr. at 3 (App. 675).

After the Trusts appealed the dismissals to this Court, the Bankruptcy Court granted the Trusts' separate request to certify the dismissal order for a direct appeal to the Third Circuit, on the ground that these appeals involve a controlling question of law (i.e., the proper definition of the term "business trust" under the Bankruptcy Code) for which there is no controlling decision and on which the lower courts within this Circuit have diverged. *See* Order at 9, No. 25-bk-15241, ECF No. 286.

---

[8] The latter assumption was unsupported by any evidence that the Manors reimbursed the Trusts' obligations to their contractors prior to the onset of the COVID-19 pandemic. From that point, the Manors began directly paying these obligations in lieu of the rental payments that the Manors could no longer afford, and which had been previously calculated under the governing documents to include the Trusts' payment of their own obligations.

[9] As noted, this Court has since denied LV1's motion to vacate the stay pending appeal. *See, e.g.*, Order, No. 26-cv-2170, ECF No. 35.

"Conceivably," the Bankruptcy Court remarked, "the Third Circuit will articulate a novel test in the process or simply disagree with this Court's application of law to fact." *Id.* at 7. On August 21, 2026, in a two-to-one decision, a Third Circuit panel denied the petitions for direct appeal. *See* Order, Nos. 26-8020 & 26-8021, ECF No. 16.

**STANDARD OF REVIEW & SUMMARY OF ARGUMENT**

This Court has jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts. 28 U.S.C. § 158(a)(1). Here, the Court reviews the Bankruptcy Court's dismissal of the Trusts' Chapter 11 cases for abuse of discretion. *In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999). In the process, this Court exercises plenary review over the Bankruptcy Court's legal conclusions and reviews its factual findings for clear error. *See id.*; *see also In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc).

Matters of statutory interpretation are legal determinations that are subject to de novo review. *In re Makowka*, 754 F.3d 143, 147 (3d Cir. 2014). Where, as here, "a bankruptcy court must settle on a legal test" to interpret the Bankruptcy Code, the "choice of standard really resides with the next court," which "reviews such a legal conclusion without the slightest deference." *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 393-94 (2018). By contrast, the clear-error standard of review applies to the Bankruptcy Court's

findings of historical fact. *See id.*; *see also In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 118 F.4th 322, 345 (3d Cir. 2024).

An abuse of discretion may consist of improperly applying law to fact. *See Montgomery v. Pinchak*, 294 F.3d 492, 498 (3d Cir. 2002). And because this appeal contests the Bankruptcy Court's "primarily legal" application of undisputed facts to a statutory standard, this Court reviews that determination de novo as well. *See Village at Lakeridge*, 583 U.S. at 396; *In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020); *see also Gov't Emps. Ret. Sys. of Virgin Islands v. Gov't of Virgin Islands*, 995 F.3d 66, 78 (3d Cir. 2021) ("We review any mixed questions of fact and law de novo insofar as 'the primary facts are undisputed and only ultimate inferences and legal consequences are in contention.'" (quoting *U.S. Gypsum Co. v. Schiavo Bros., Inc.*, 668 F.2d 172, 176 (3d Cir. 1981))).

Here, no matter the precise standard of review, the dismissal of the Trusts' Chapter 11 cases should be reversed, for the reasons that follow.

I. Section 109 of the Bankruptcy Code permits a "person" to be a debtor under Chapter 11, and a "person" includes a "corporation," which the Code defines to include a "business trust." *See* 11 U.S.C. §§ 101(9)(A)(v). Congress did not further define the term "business trust." Properly construed, this phrase encompasses trusts created primarily for the purpose of transacting business or carrying on activity for profit, rather than merely to hold, preserve, and distribute property for

beneficiaries. This analysis requires evaluating all the facts and circumstances, and while corporate-like formalities may evidence a business purpose, none are statutory prerequisites. Relevant principles of statutory interpretation, the subsection's evolution, and prior federal circuit decisions analyzing the question together reinforce this conclusion.

II.A. Here, based on the record evidence, the Trusts meet the Bankruptcy Code's standard for business trusts when properly formulated and applied. The proof established that the Trusts were organized primarily for the business purpose of owning, financing, leasing, maintaining, improving, and profiting from income-producing real estate on which their related Manors operate personal care homes. The Trust Agreements and circumstances surrounding their creation and amendment illustrate that the Trusts were formed not mainly to preserve real property, but rather to facilitate substantial financing transactions that exposed the properties to business risk. The Trusts implemented this business purpose over many years by borrowing tens of millions of dollars in successive transactions, operating for an extended period under regulatory oversight, collecting business revenues, maintaining fiscal reserves, keeping audited records, engaging contractors to perform construction and repairs on the properties, ensuring payment of the mortgages and other charges, and distributing profits to the Trusts' primary beneficiary.

II.B. The Bankruptcy Court placed undue emphasis on aspects of the Trusts resembling those seen in traditional or nonbusiness trusts, while appearing to treat those characteristics as equivalent in importance to whether the Trusts were created for a business purpose. At best, these other features may inform such a determination. And here, they do not justify concluding that the Trusts' primary purpose was asset preservation or estate planning. Moreover, the prior decisions on which the Bankruptcy Court relied as support for dismissing the Trusts' Chapter 11 cases are factually distinguishable or adopted overly stringent tests with elements that the statute does not demand.

## ARGUMENT

### I. A Trust Created Primarily for a Business Purpose Is a "Business Trust" Under the Bankruptcy Code.

Section 109 of the Bankruptcy Code permits a "person" to be a debtor under Chapter 11. *See* 11 U.S.C. § 109(d). A "corporation" is such a "person." *Id.* § 101(41). And a corporation "includes" any of the following: "(i) association having a power or privilege that a private corporation, but not an individual or a partnership, possesses; (ii) partnership association organized under a law that makes only the capital subscribed responsible for the debts of such association; (iii) joint-stock company; (iv) unincorporated company or association; or (v) business trust." *Id.* § 101(9)(A).

This appeal centers on the last term—"business trust"—which the statute does not further define. The pertinent legislative and judicial authorities support an overarching, straightforward rule: a trust qualifies as a "business trust" under the Bankruptcy Code if created primarily for the purpose of transacting business or carrying on activity for profit, rather than merely to hold, preserve, and distribute property for beneficiaries. Corporate-like features may be relevant evidence of business character but are not statutory prerequisites. The trust's post-formation operations may also shed light on its purpose. This correct construction sets the framework for concluding that each Trust here is a "business trust."

As with any Code provision, interpreting this term starts with the language. *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011). Where, as here, "Congress does not furnish a definition," courts should "generally seek to afford a statutory term 'its ordinary or natural meaning.'" *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)). The words used must be construed "'in their context and with a view to their place in the overall statutory scheme.'" *EPA v. Calumet Shreveport Ref., LLC*, 145 S. Ct. 1735, 1750 (2025) (quoting *Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809 (1989)).

As a default rule, the Bankruptcy Code's eligibility provisions are textually presumed to be inclusive. Courts "are loath to infer the exclusion of certain classes

of debtors from the protections of Chapter 11, because Congress took care in § 109 to specify who qualifies—and who does not qualify—as a debtor under the various chapters of the Code." *Toibb v. Radloff*, 501 U.S. 157, 161 (1991).

Further, in all cases, a statutory phrase's evolution may inform its meaning. *See generally Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 223 (2024); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 238 (1989). In this regard, section 101(9)(A)(v)'s use of the phrase "business trust" is a relatively modern invention. "Prior to 1978, the Bankruptcy Code's definition of 'corporation' did not include the term 'business trust,' but instead provided that a 'corporation' could be 'any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument.'" *In re Kenneth Allen Knight Trust*, 303 F.3d 671, 679 (6th Cir. 2002) (quoting 11 U.S.C. § 101(8) (1976 ed.)).

Enacted in 1926, the prior language thus began broadly—covering "any business conducted by a trustee or trustees"—before adding a qualifier—"wherein beneficial interest or ownership is evidenced by certificate or other written instrument." As one court wrote of this provision: "If Congress had intended to include within its definition of 'corporation' all trusts reduced to writing in which the trustees are empowered to conduct a business, it could easily have done so." *Pope & Cottle Co. v. Fairbanks Realty Trust*, 124 F.2d 132, 135 (1st Cir. 1941).

In 1978, Congress eliminated the qualifier, so that "business trust" eligibility no longer turns on such formalities. *See* 11 U.S.C. § 101(9)(A)(v). On its face, "[t]he range of the definition shows the intention of the Congress to widen rather than to restrict the term." *City of Lincoln v. Ricketts*, 297 U.S. 373, 375 (1936) (construing a different part of the predecessor to section 101(9)(A)). This change occurred as part of "'a substantial overhaul of the system.'" *In re Cont'l Airlines, Inc.*, 932 F.2d 282, 287 (3d Cir. 1991) (quoting *Ron Pair Enters.*, 489 U.S. at 240).

The otherwise scant legislative history describes the overall definition of "corporation" as "similar to" the pre-1978 formulation, and it notes that the Code's definition of "person" excludes "an estate or a trust" more generally. *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 313 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 25 (1978). Indeed, "[t]he bankruptcy law of this country, unlike that of England, has always barred estates from relief in bankruptcy." *Cath. Sch. Emps. Pension Trust*, 599 B.R. 634, 655 (B.A.P. 1st Cir. 2019) (citing 1 Collier on Bankruptcy § 4, at 200 (13th ed. 1923)).[10] The current Bankruptcy Code lists an

---

[10] "Under both the Bankruptcy Act of 1867 and the Bankruptcy Act of 1898 the courts construed the word 'person' in the eligibility provision to exclude estates." *Cath. Sch. Emps. Pension Trust*, 599 B.R. at 655 (citations omitted). "In denying general eligibility to trusts, Congress presumably viewed trusts, even those of the intervivos variety, as being much like estates in that they are typically enmeshed in an estate plan and are under the control of state probate courts." *Id.* at 656.

"estate" and a "trust" as types of "entities," under a different provision from the one identifying who may be a Chapter 11 debtor. *See* 11 U.S.C. § 101(15).

These sources suggest only that ordinary trusts and estates are ineligible to be bankruptcy debtors.[11] It does not follow that a trust that Congress separately identified as a "business trust" must possess unstated characteristics or satisfy unstated formalities.

As noted, section 101(9)(A)(v) does not explicitly set forth the parameters of a "business trust." But the phrase must be given a practical and flexible meaning, since that section identifies a business trust as something that a corporation "includes." As used in the Bankruptcy Code, the word "includes" is "not limiting." 11 U.S.C. § 102(3). Thus, "the examples are nonexclusive, so that other entities with properties similar to those in the list and dissimilar to the exclusions from the list should also be treated as corporations for purposes of the Code." 1 Collier on Bankruptcy ¶ 101.09 (2025); *accord Asociacion de Titulares de Condominio Castillo*, 581 B.R. 346, 359 (B.A.P. 1st Cir. 2018) ("Under the Bankruptcy Code's rules of construction, the term 'includes' is 'not limiting,' 11 U.S.C. § 102(3); therefore, a potential debtor may be a 'person' even if it does not fall into any of the

[11] It bears noting that, as used in the Bankruptcy Code's definition of "entity," the term "estate" differs from the separate concept of a "bankruptcy estate"—which is established as of a bankruptcy petition's filing and which comprises, subject to certain exceptions, "wherever held and by whomever held . . . all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1).

per se definitions under § 101(41)." (collecting authority)).[12] Given that this definitional subsection sweeps in omitted entities, its actual terms should be construed functionally, to include candidates sufficiently dissimilar to those that Congress meant to keep out of bankruptcy—such as the ordinary trust or estate.

Moreover, because section 101(9)(A)'s list is phrased in the disjunctive—using the word "or"—each of its terms has a measure of independent effect. Where, as here, "Congress has separated terms" in a list "with the conjunction 'or,' it is presumed that Congress intended to give the terms their separate, normal meanings." *In re Cont'l Airlines*, 932 F.2d at 288 (internal quotation marks omitted) (construing section 1110(a)'s exemption from bankruptcy's automatic stay). Thus, a business trust must be something besides just a surrogate corporation, and it need not have all the qualities of entities mentioned in the preceding clauses.

The federal courts of appeals that have substantively analyzed the term "business trust" in section 101(9)(A)(v) have endorsed a holistic inquiry into the trust's purpose. As the Second Circuit recognized, "most courts agree that a basic distinction between a business trust and other trusts is that business trusts are created

[12] One bankruptcy court has concluded that, given "the use of the non-exclusive term, 'includes,'" the Bankruptcy Code's eligibility criteria "are sufficiently liberal to permit an inchoate or *de facto* limited liability company," which never registered as such under state law, to seek Chapter 11 relief. *In re 4 Whip, LLC*, 332 B.R. 670, 672 (Bankr. D. Conn. 2005). Such an inchoate version of an unlisted entity is twice removed from section 101(9)(A)'s express terms.

for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res." *In re Secured Equip. Trust*, 38 F.3d at 89. The Sixth Circuit then adopted a purposive inquiry as the governing standard. *See In re Kenneth Allen Knight Trust*, 303 F.3d at 676 ("[T]rusts created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors qualify as business trusts, while trusts designed merely to preserve the trust res for beneficiaries generally are not business trusts." (internal quotation marks omitted)); *see also In re Treasure Island Land Trust*, 2 B.R. 332, 334 (Bankr. M.D. Fla. 1980) ("The basic distinction between business trusts and nonbusiness trusts is that business trusts are created for the purpose of carrying on some kind of business or commercial activity for profit . . . .").[13]

Although arising in the distinct context of federal income taxation, the Supreme Court's decision in *Morrissey* likewise summarized that "[i]n what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains." 296 U.S. at 357.[14]

[13] The Eighth Circuit has affirmed, without analysis, a bankruptcy court's decision that a trust created for the purpose of protecting and preserving assets for certain family members' benefit did not qualify as a business trust. *See In re Mosby*, 791 F.2d 628, 628 (8th Cir. 1986) (per curiam).

[14] That decision then outlined "the salient features of [such] a trust" that would render the trust an association under then-prevailing income tax laws, *Morrissey*, 296 U.S. at 359—as opposed to a business trust under today's Bankruptcy Code.

As these sources reinforce, appropriately construed, section 101(9)(A)(v) excludes principally estate-planning and wealth-preservation entities, while allowing trusts organized primarily for a business purpose to benefit from bankruptcy. Whether a trust is created primarily to transact business or carry on activity for profit, rather than to protect and preserve the res, will depend on the trust documents, the parties' intentions, and the trust's post-formation operations. In this analysis, "the presence or absence of a profit motive" will be "influential." *In re Secured Equip. Trust*, 38 F.3d at 90-91.

Defining a "business trust" by reference to business purpose, as appellate decisions have recognized, presents a reasonable and workable standard in line with the statutory text. It mirrors the subsection's overall breadth, making bankruptcy available to a wide array of organizational debtors beneath the "corporation" umbrella. That broad and inclusive category extends to closely held corporations, single-member limited liability companies (which section 101(9)(A) does not even mention), and unincorporated companies or associations. A business-purpose trust fits comfortably. Indeed, "[i]t would be an odd method of interpretation to rummage deep into the legislative history, and, finding practically nothing, conclude that this silence implies that Congress could not have meant what it said when it wrote the statute." *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 377 (3d Cir. 2012).

Here, the Bankruptcy Court agreed with certain of these principles. That court opined that whether a trust is created (and also maintained) for the purpose of conducting business "essentially restates the issue" of whether the trust is a "business trust" under section 101(9)(A)(v). *In re Whitehall Trust*, 678 B.R. at 510 (App. 22). The Bankruptcy Court further acknowledged that "this determination necessarily hinges on the facts and circumstances of a given case." *Id.* (App. 22). To that end, features such as unbending adherence to state law procedures, indefinite existence, transferable interests, or other corporate hallmarks may aid in evaluating a trust's business character. Yet they are not (and should not be) absolute prerequisites, and none displaces the fundamental inquiry into the trust's primary purpose.

As with tests devised to answer other questions, state laws "on business trusts and more traditional trust relationships" may be relevant, if "not of themselves determinative." *GBForefront*, 888 F.3d at 40 (setting the standard for deciding whether a trust assumes its beneficiaries' citizenship for purposes of federal diversity jurisdiction). As another input, a court in a bankruptcy case might also consider whether the "trust facilitates a donative transfer" or "implements a bargained-for exchange." *Id.* In this context, however, the trust's primary purpose controls whether it is a "business trust" under the Bankruptcy Code. And in that analysis, "[a] trust does not need to have employees, an independent board, shareholders, alienable ownership interests, and other 'corporate' attributes to be a 'business trust,'

especially after the 1978 amendments." *In re Rubin Fam. Irrevocable Stock Trust*, 2013 WL 6155606, at *8 (Bankr. E.D.N.Y. 2013) (citing *In re General Growth Props., Inc.*, 409 B.R. 43, 70-71 (Bankr. S.D.N.Y. 2009)).

## II. The Bankruptcy Court Erred in Concluding that Whitehall Trust and Saucon Trust Are Not Business Trusts Eligible for Bankruptcy.

The Bankruptcy Court's conclusion that neither Whitehall Trust nor Saucon Trust is a "business trust" under 11 U.S.C. § 101(9)(A)(v) rests on an unduly constricted view of what constitutes a qualifying business purpose in this context. That court treated the inquiry into purpose as a baseline, intermingled with other criteria of unassigned importance, while disregarding facts supporting a contrary conclusion.

Based on the record evidence, the Trusts meet the Bankruptcy Code's standard for business trusts when properly formulated and applied. Accordingly, these Trusts should not be ousted from reorganizing under Chapter 11. Rather, their bankruptcy cases are entitled to proceed.

### A. Whitehall Trust and Saucon Trust Were Formed for Similar Business Purposes.

The proof established that the Trusts were organized primarily for the business purpose of owning, financing, leasing, maintaining, improving, and profiting from income-producing real estate on which their affiliated Manors operate personal care homes. The question is not whether the Trusts possess some features of traditional

trusts, which they do. It is whether, considering all the circumstances, the Trusts were created primarily to transact business with a goal of making a profit, which they were.

### 1. The Trusts' formation and relevant documents reflect a purpose to promote a business enterprise.

Events surrounding the Trusts' formation reflect that Mr. Atiyeh created them in 2007 for the business purpose described above. The Trusts then took ownership by conveyance of the real properties on which the Manors operated their personal care home businesses. DX-3, DX-14 (App. 292, 440).

As Mr. Atiyeh testified, the Trusts were formed for the goals of obtaining financing, leasing real estate to the personal care homes, collecting rent, paying lenders, and ensuring payment of taxes. Tr. at 15-16, 21-22, 30, 53 (App. 201-202, 207-208, 216, 239). The Trust Agreements authorize these actions, by empowering the Trustees to hold property as an investment; to rent or lease property; to make all necessary repairs and improvements; to pay taxes, insurance premiums, and other assessments; and to consent to the sale, mortgage, or lease of property. DX-4 § 3, DX-13 § 4 (App. 301-304, 425-430).

In particular, each Trust Agreement authorizes the Trustee to enter into financing arrangements and related documents with specified lenders. The Whitehall Trust Agreement mentions HUD and a mortgage loan for a Project relating to Whitehall Manor. DX-13 §§ 4, 15 (App. 425, 433-435). The Saucon Trust

Agreement initially mentioned National Penn Bank. DX-4 § 3.12 (App. 302). Amendments in 2012 then authorized that Trust to enter into a financing transaction with HUD for a Project relating to Saucon Valley Manor. *Id.*, First Amend. § 1.3, Second Amend. (App. 311-316). The applicable HUD Regulatory Agreements—which the Trust Agreements cross-reference—defined the relevant "Project" as including the mortgaged property and all its other assets "used in or owned by the business conducted on said mortgaged property." DX-9 § 13(e), DX-21 § 13(e) (App. 389, 477).

Although neither Trust directly paid Mr. Atiyeh for conveying this real estate, he did so with the obvious expectation of future profit, delivered through the beneficial interests that he received in exchange. Lenders stood to benefit as well, as did the Manors, by virtue of the financing. These were not gratuitous donations: the settlor and several businesses expected payment at various points in time. Indeed, these specific loans are made available to finance the provision of state-licensed care facilities (i.e., businesses). *See* 12 U.S.C. § 1715w; 24 C.F.R. § 232.2. To qualify for this program, an eligible borrower must be a single-asset entity acceptable to HUD. *See* 24 C.F.R. § 232.3. Mr. Atiyeh testified that he understood that HUD, to make the loans, required that the properties be in trust, though he did not recall all the reasons. Tr. at 16, 47-48 (App. 202, 233-234). Moreover, his avowed goal was to "profit from managing the real estate venture." *Id.* at 36 (App. 222).

Viewed as a whole, the Trust Agreements and surrounding events do not reveal a principal intent merely to protect and preserve the real properties. Rather, the properties were placed in trust and repeatedly mortgaged for tens of millions of dollars, for the purpose of refinancing, improving, and maintaining them. Doing so exposed the properties to the business risk that the Manors could not profitably meet obligations, and to the related financial risk that a lender could seek to foreclose on the properties. As we know, these risks materialized. "In light of all this risk-taking with the *res,* it would defy reason to conclude that the *primary* purpose of the Trust Debtors [wa]s to 'protect and preserve' it." *In re Rubin Fam. Irrevocable Stock Trust*, 2013 WL 6155606, at *9.

Declaring the Trusts ineligible to pursue Chapter 11 relief elevates form over substance. If the real properties had instead been held by limited liability companies, for example, there would be no doubt about the entities' bankruptcy eligibility. Nor should the fact that Mr. Atiyeh used trusts to implement these business goals produce a different result, when the Bankruptcy Code permits a "business trust" to be a Chapter 11 debtor. Indeed, these cases arose because of the typical commercial problem of a creditor's undertaking efforts to collect on defaulted loan obligations. The Trusts seek the ordinary bankruptcy remedy of restructuring the debts, while balancing the Debtors' and all creditors' ongoing interests within the Bankruptcy Code's framework. They do not seek to adjudicate competing beneficiaries' rights,

evaluate a fiduciary's conduct, or determine any other matter typical of estate or probate administration.

To be sure, as the Bankruptcy Court observed, no filing at their formation formally registered these Trusts as business trusts under Pennsylvania law. *See In re Whitehall Trust*, 678 B.R. at 510 (App. 22). Aiming for a tax exemption, the property deeds recited that the transfers were from an individual to a living trust. *See* DX-3, DX-14 (App. 292, 440). In general, however, "the particular labels affixed by state law are not of themselves determinative." *GBForefront, L.P.*, 888 F.3d at 40. Even if "tax planning was [a] motivating factor," that "alone does not establish whether the trust is created for a business or a profit purpose or to protect and preserve the res." *In re Jin Suk Kim Trust*, 464 B.R. 697, 704 (Bankr. D. Md. 2011).

In any event, the State of Pennsylvania rejected the deed's characterization of Whitehall Trust. In November 2008, the State Board of Finance and Revenue assessed a transfer tax on the conveyance, concluding that (i) the HUD-related irrevocability period disqualified this Trust from being a tax-exempt "Living Trust"; and (ii) because "Whitehall Trust was structured to operate a business by the Trustee," this Trust also was not an "Ordinary Trust" qualifying for a tax exemption. DX-16, at 3-4 (App. 449-450).

Then and now, Pennsylvania's Realty Transfer Tax Act has defined an "ordinary trust" to include a trust organized "primarily for the purpose of protecting,

managing or conserving" property, but to exclude a trust "that has an objective to carry on business and divide gains." 72 Pa. Stat. § 8101-C. Pennsylvania thus treated Whitehall Trust as having an objective to carry on business and divide gains, rather than having been formed primarily for the purpose of protecting, managing, or conserving real estate. In this respect, what goes for Whitehall Trust also goes for Saucon Trust, which was indisputably structured for a similar purpose, though with a different initial lender (later replaced by a HUD-backed M&T loan, also with an irrevocability period). Although it does not resolve the statutory question presented here, the State Finance Board's position shows that a relevant governmental body did not view these transactions as resembling the type of donative transfers traditionally associated with ordinary family trusts.[15]

**2. The Trusts effectuated their business purpose over time.**

The Bankruptcy Court concluded that, to qualify for Chapter 11 relief, the Trusts had to be "created *and* maintained for business purposes." *In re Whitehall Trust*, 678 B.R. at 516 (emphasis added) (App. 33). That court derived the "maintenance" prong from *Morrissey*—not a bankruptcy case. *See id.* at 507

[15] While the motion to dismiss was pending in the Bankruptcy Court, the Trusts applied for registration as Domestic Business Trusts with the Pennsylvania Department of State, Bureau of Corporations and Charitable Organizations. In February 2026, the Debtors received confirmation that the State had assigned Saucon Trust and Whitehall Trust (n/k/a "Whitehall Trust for Senior Care") dedicated Domestic Business Trust identification numbers. While not dispositive, these publicly verifiable designations further support the Trusts' arguments here.

(App. 16). A primary business purpose satisfies the test for a "business trust" under the Bankruptcy Code. *See supra* at 22-31.

That said, a trust's post-formation operations may reflect its purpose. *See In re Kenneth Allen Knight Trust*, 303 F.3d at 680. And insofar as "a trust must engage in business-like activities to qualify as a business trust," *In re Secured Equipment Trust*, 38 F.3d at 89, the established record of the Trusts' activities here confirmed their business purpose. Over time, their actual operations effectuated the authority granted in their governing documents and the goals for which they were formed.

As noted, between 2007 and 2012, inclusive, the Trusts entered into substantial financing transactions involving mortgage loans totaling tens of millions of dollars. Whitehall Trust procured a HUD-backed mortgage loan from M&T, while Saucon Trust incurred successive mortgage obligations, including construction financing used for building out Saucon Valley Manor, and later a HUD-backed refinancing loan also from M&T. To qualify for the HUD loans, the projects needed to demonstrate adequate cash-flow ratios, stability, and profitability. Tr. at 29-30 (App. 215-216).

In implementing this intentional business structure, the Trusts leased their respective properties to the Manors, which operated the personal care home businesses thereon. During the HUD loans' term, the Trusts needed to maintain reserves for major repairs or improvements to the buildings, undertake any necessary

repairs, undergo audits (individually and with the Manors), and keep business records such as profit-and-loss statements and balance sheets. The Trusts used a contractor for construction, maintenance, and repairs for both Manors. The Trusts also had a management company that oversaw their operations, processed the rental payments, and reconciled their accounts. Meanwhile, the Trusts' beneficiary, Mr. Atiyeh, received profit distributions. *See supra* at 10-11 (cataloguing relevant evidence).

As is undisputed, the Trusts exercised these powers and maintained these activities for more than a decade. Far from peripheral, these financial transactions and duties were interwoven with the Trusts' "profit-driven" existence. Tr. at 36 (App. 222). A trust established merely to preserve a res typically seeks to maintain existing assets for beneficiaries. By contrast, these Trusts borrowed money, financed improvements, expanded facilities, entered long-term security arrangements, commissioned repairs, repaid third parties, and managed real estate dedicated to generating income from the proceeds of related businesses.

The Bankruptcy Court neither made contrary factual findings nor cited contrary proof. Instead, that court acknowledged that "the Trust instruments allow the Trusts to play an active role in Manor construction, renovation, and upkeep." *In re Whitehall Trust*, 678 B.R. at 514 (App. 29). Yet the Bankruptcy Court concluded that the Trusts' rent-collection activities were too passive to constitute a valid

business purpose, at formation or thereafter. *See id.* (App. 29). It also cited the absence of "any indication that the Trusts ever had officers or retained employees," and noted that a contractor handled the maintenance and repairs for the Manors, which (despite no evidence so indicating) would "likely" have borne the costs. *Id.* (App. 29).

There can be no real dispute that the Trusts engaged in the business of operating these real properties. The point of departure seems to be the depth or extent of that engagement. But the Bankruptcy Court ignored the purpose animating the Trusts' very creation and assumption of the properties: to effectuate a business refinancing plan by procuring substantial loans. The Trusts were not, for example, longstanding family trusts that later borrowed against property already held in trust. Instead, they were created as part and parcel of the business financing structure itself.

Especially when viewed through that lens, consolidated control, the settlor's being a beneficiary, and engaging in financial management do not defeat a conclusion that these Trusts qualify as "business trusts" eligible for bankruptcy relief. To compare, *In re Kenneth Allen Knight Trust* involved a trust that an individual had funded with his own holdings, that he controlled, that designated only him and his daughters as beneficiaries, and through which he conducted affiliates' financial activities, including by obtaining financing. *See* 303 F.3d at 674-75. The Sixth Circuit held "that the bankruptcy court was correct in finding that the primary

purpose of the Trust was to transact business or carry on commercial activity for the benefit of [the individual] investor, and not merely to preserve the Trust's res for the beneficiaries." *Id.* at 680; *see also In re John Q. Hammons Fall 2006, LLC*, 573 B.R. 881, 895 (Bankr. D. Kan. 2017) (reaching similar result on analogous facts, while deeming insignificant the absence of "corporate formalities [that] are also not shared by other categories of entities included in the definition of 'corporation'" under section 101(9)(A)(v)); *In re Rubin Fam. Irrevocable Stock Trust*, 2013 WL 6155606, at *8 ("[E]ven if a trust does not 'operate a business' from a strict tax or accounting perspective, that does not preclude it from 'doing business' in the common, ordinary sense of the term . . . ."). This case calls for the same outcome.

### B. These Trusts Are Sufficiently Distinct from Estate-Preservation or Other Nonbusiness Trusts to be Eligible for Bankruptcy.

The Bankruptcy Court's dismissal opinion unduly focused on certain aspects of these Trusts resembling those seen in "traditional" or nonbusiness trusts. Those characteristics included restraints on transferring the Trusts' beneficial interests, a finite existence, and an individual's having a "complete concentration of ownership interests." *In re Whitehall Trust*, 678 B.R. at 513 (App. 28). The Bankruptcy Court's analysis effectively elevated these other considerations to a significance level on par with whether the Trusts were formed (or even maintained) for a business purpose.

These inquiries are not equal in importance, however. At best, a trust's various features may aid in determining whether it is a business trust under the Bankruptcy

Code. And here, they do not justify concluding that these Trusts' primary purpose was asset preservation or estate planning. Not when the Trusts indisputably borrowed tens of millions of dollars for a business-financing purpose in successive transactions, operated for an extended period under regulatory oversight, collected business revenues, maintained reserves, kept audited records, and engaged contractors to undertake construction and repairs.

While relevant, signs of succession planning or a family-control structure do not drain a business trust of that character, nor does a capped duration (in this case, an outer limit of half a century). *See, e.g.*, *In re Kenneth Allen Knight Trust*, 303 F.3d at 676 (business trust had limited duration and intra-family beneficiaries); *In re John Q. Hammons*, 573 B.R. at 895 & n.6 (business trust contained "provisions for tax planning," had a "spendthrift provision," and designated "only a limited number of beneficiaries" after the settlor's death); *In re Jin Suk Kim Trust*, 464 B.R. at 700 (grantee ran business trust "as a family real estate enterprise with the intention of maximizing family wealth, and fairly aggressively leveraged the initial real estate investment that was transferred to the Debtor").

The Bankruptcy Court also overread the Second Circuit's decision in *In re Secured Equipment Trust* as categorically holding that a "trust's 'business' of leasing collateral and retaining professionals" cannot support a valid business purpose. *In re Whitehall Trust*, 678 B.R. at 513 (App. 28). In fact, the Second Circuit held that a

sale-and-leaseback of aircraft, financed by assorted investors, constituted a secured financing, no more and no less. *See In re Secured Equip. Trust*, 38 F.3d at 86 ("Although the transaction was called a sale/leaseback, there is no dispute that it was a secured financing."). The trust there had the "*sole* responsibility of protecting the certificateholders' security interest." *Id.* at 90 (emphasis added). Nor did the concept of profit enter the equation, since "any payments in excess of amounts due under the Indenture were to be returned," rather than paid to the trust's beneficiaries (the noteholders). *Id.* Here, by contrast, the grantor did not lease back the properties, the Trusts had maintenance responsibilities, the Trusts handled tax and insurance obligations for the Manors, the HUD loans required that the borrowers be separate entities, and the Trusts' beneficiary received profit distributions.

The Bankruptcy Court additionally surveyed other decisions "worth mentioning," but none alters the outcome here. *In re Whitehall Trust*, 678 B.R. at 509 (App. 21). One case was *In re Dille Family Trust*, which admitted that "the federal question of what constitutes a 'business trust' in bankruptcy is not an easy question to answer," leading to "difficulty finding a standard definition." 598 B.R. at 192. The court there settled on a standard asking "whether the trust in-fact has all of the indicia of a corporate entity." *Id.* at 194. That extratextual step asks too much: rather than search for all corporate characteristics, a court should ask simply whether a trust has a primary business purpose, rendering the entity an economic enterprise

suited to a reorganization.[16] Indeed, other business entities that routinely file for bankruptcy, such as limited liability companies, are not expressly enumerated in the Bankruptcy Code and do not possess all corporate characteristics.[17] Another case was *In re Blanche Zwerdling Revocable Living Trust*, which more aptly stated that "whether a trust is a business trust is a fact-sensitive determination that goes beyond just the trust documents," focusing "on both the purpose of the trust and [its] actual operations." 531 B.R. at 545. The court there held that a trust owning the grantor's personal property, bank accounts, and primary residence, for a granddaughter's benefit, was not a business trust.

Finally, insofar as the Bankruptcy Court cited the Manors' nonpayment of rent for a number of years as a reason to dismiss the Trusts' bankruptcy cases, that determination missed the mark. The Bankruptcy Court wrote that "the presence of *ongoing* business operations, or lack thereof, is also highly relevant to an eligibility determination arising under § 109." *In re Whitehall Trust*, 678 B.R. at 515 (App. 32).

---

[16] For its part, *In re Eagle Trust*—a district court decision the Bankruptcy Court discussed—likewise applied too strict a test in requiring a trust to "have been created in compliance with state law" to be a business trust. 1998 WL 635845, at *5. At any rate, the personal trust there had "no accounts receivable, accounts payable, line of credit, or other business loans." *Id.*

[17] *See, e.g.*, 11 U.S.C. § 101(9)(A)(i) (extending Chapter 11 eligibility to an association with any distinctly corporate power or privilege); *In re KRSM Props., LLC*, 318 B.R. 712, 719 (B.A.P. 9th Cir. 2004) (noting that debtor LLC had elected "pass-through" status, avoiding corporate-style taxation and reporting all "profits or losses on a personal tax return as if the business was a sole proprietorship").

It cited the Manors' nonpayment of rent as evidence "that the instant Trusts lack a valid business purpose." *Id.* (App. 32).

The later nonpayment of intercompany obligations does not negate the earlier and extensive record of the Trusts' having engaged in business activities. To the contrary, the Trusts' financial straits are all the more reason for a Chapter 11 reorganization. As the Supreme Court has held in the context of individual debtors, "the plain language of the Bankruptcy Code disposes of the question." *Toibb*, 501 U.S. at 160. "The Code contains no ongoing business requirement for reorganization under Chapter 11," although many provisions "certainly are designed to aid in the rehabilitation of a business." *Id.* at 160, 163.

That the Trusts might have failed to meet their financial obligations does not disqualify them from Chapter 11 relief. If nonpayment of debts by the time of filing dictated whether a debtor were a business trust, that status would change, potentially back and forth, based on whether it was meeting its obligations. Such a construction also would offer *greater* bankruptcy eligibility to solvent entities than to insolvent entities. But that cannot be right, when financial distress and pressure from creditors are standard precursors to bankruptcy.

In all, that the Trusts were formed, and long maintained, for a business purpose suffices to open the door to Chapter 11. A threshold ruling that the Trusts

are eligible for bankruptcy would simply—and appropriately—allow their proposed joint plan of reorganization a chance to be fairly evaluated on the merits.

## CONCLUSION

Because each of Whitehall Trust and Saucon Trust is a "business trust" that is eligible for Chapter 11 bankruptcy relief, this Court should reverse the Bankruptcy Court's order dismissing these Trusts' bankruptcy cases.

Dated: August 28, 2026

Respectfully submitted,

**ROBINSON & COLE LLP**

By: */s/ Rachel Jaffe Mauceri*
Natalie D. Ramsey (#41412)
Rachel Jaffe Mauceri (#209823)
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel.: (215) 398-0600
nramsey@rc.com
rmauceri@rc.com

Eric Del Pozo
(*admitted pro hac vice*)
One State Street
Hartford, CT 06103
Tel.: (860) 275-8200
edelpozo@rc.com

*Counsel for Appellants Whitehall Trust and Saucon Trust*

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that this brief complies with the type-volume and typeface limitations in Federal Rule of Bankruptcy Procedure 8015(a)(5)–(a)(7) because this brief contains 10,671 words, excluding the parts of the brief exempted by Rule 8015, and because it has been prepared in a proportionally spaced 14-point font.

Dated: August 28, 2026

/s/ *Rachel Jaffe Mauceri*
Rachel Jaffe Mauceri

## CERTIFICATE OF SERVICE

I, Rachel Jaffe Mauceri, certify that a true and correct copy of the foregoing brief and appendix have been filed electronically, which accomplished service on all counsel of record, and are available for viewing and downloading from this Court's ECF System.

Dated: August 28, 2026

*/s/ Rachel Jaffe Mauceri*
Rachel Jaffe Mauceri